**TEXAS ASSOCIATES, Inc. v. JOE BLAND CONST. CO.**

No. 9783.

Court of Civil Appeals of Texas. Austin.

July 6, 1949.

Rehearing Denied July 23, 1949.

414

Powell, Wirtz & Rauhut, Ralph W. Yarborough, John D. Cofer, all of Austin, for appellant.

W. J. Hodge, and David L. Tisinger, of Austin, for appellee.

GRAY, Justice.

Appellant purchased, from the War Assets Administration of the United States Government, seven buildings, all located on the Magnesium Plant site near the City of Austin, Texas, and, under the terms and conditions of sale set out in the "Invitation for Bids and Specifications of Sale of Buildings and Installed Equipment," appellant was required to dismantle the buildings and remove all equipment, material and refuse from the premises. On August 21, 1947, appellant entered into a contract with appellees whereby appellees agreed to dismantle said buildings and convert the material therein into salvage and scrap and to load the same on railroad cars. The parties will be here designated as they were in the contract, namely: appellant as owner and appellees as contractors.

By paragraph one of the contract, the contractors agreed to perform all work and furnish equipment, tools, materials and labor necessary to:

(a) Disassemble and dismantle all machinery, equipment and appliances in the buildings in such manner that the greatest practical amount thereof could be salvaged as secondhand materials, and that which

could not be so salvaged would be saved as scrap.

(b) Load all salvage on railroad cars blocked and secured for shipment in a manner sufficient to meet the requirements of the carrier.

(c) In like manner, load all scrap.

(d) Dispose of debris, allowing contractors one-third of the sales price of brick taken from linings of cells in addition to other compensation received by the contractors under the contract. Such brick to be stored on the premises or loaded on cars.

Paragraph 2 is as follows:

"(2) All work hereunder shall be performed under the supervision and in accordance with the directions of Owner's Engineer. It is understood that the work will be so planned that salvage will be ready for shipment in time to meet sales contracts made by the Owner and that Owner will give Contractor reasonable advance notice so that contractor may plan the work in order to meet these requirements without extra cost or expense. Machinery, equipment and appliances will be dismantled either by disconnecting the component parts or by cutting or burning into smaller parts as may be required to render them most valuable as salvage. If the Contractor is of the opinion that any direction given by the Engineer is unreasonable to such an extent as to necessarily increase the cost of the work, he shall forthwith, but without stopping or delaying the work, notify the Owner in writing of Contractor's objections, specifying the actions complained of and the reason therefor. The Owner shall have cars spotted for loading, at the nearest switch, as soon as they can be procured after Owner is notified by Contractor of his loading requirements and dates of loading. Contractor agrees to perform all of said work in a good, workmanlike manner, in accordance with the directions of the Owner's Engineer and with all necessary care to recover all salvage reasonably possible. The Contractor will prosecute the work with due diligence to completion within four (4) months after this date. Except as herein otherwise provided, the Contractor will comply with the requirements of the aforesaid 'Invitation for Bids and Specifications of Sale of Buildings and Installed Equipment.' "

Paragraph 3 states the contract price to be: (a) an amount equal to $30 per ton for salvage; (b) $15 per ton for scrap. And recites payment of $45,000 to contractor as an advance payment on the contract price. For each ton of salvage loaded on the cars and shipped, as determined by railroad weights, and within ten days thereafter, contractor was to be paid $15 cash and credited with $15 against the advance payment. And for each ton of scrap loaded and weights determined as above, there was to be a credit of $15 against the advance payment. In the event the total amount of scrap exceeded 1,000 tons, the contractor was to receive $22.50 per ton for each ton in excess of 1,000. The owner guaranteed that the total amount of salvage and scrap would be not less than 3,000 tons.

Paragraph 4 provides the contractor would furnish a performance bond, and carry property damage and compensation insurance.

Paragraph 5 provides for the owner to take over in the event the contractor became bankrupt or made default.

Paragraph 6 provides for the arbitration of disputes; and paragraph 7 provides that the waiver of any defaults by either party shall not constitute a waiver of any subsequent default.

Paragraph 8 provides that the contractor shall maintain a superintendent on the job and in charge of the work to whom directions could be given by the owner or its engineer.

The contractors undertook performance. The work was not completed at the end of the four-month period, but under an alleged oral agreement, the work was continued by the contractors until February 20, 1948, when the contractors quit and thereafter instituted this suit to recover on a quantum meruit.

A trial to a jury was had and the jury found: (1) that the contractors proceeded with the work with reasonable diligence; (2) that the work was performed in such manner that the greatest practical amount of salvage would be obtained; (3) that dur-

ing the period from August 21, 1947, to December 21, 1947, contractors requested the owner to furnish sufficient cars to meet contractors' loading requirements; (4) that owner failed to furnish such cars as soon as they could have been procured; (5) that such failure to furnish cars caused contractors extra cost and expense; (6) that but for such failure of owner to furnish sufficient cars, contractors would have finished the work by December 21, 1947; (7) that contractors protested the failure of owner to furnish sufficient cars; (8) that contractors were diligent in making such protests; (8-a) that after making such protests contractors did not agree to continue the work and accept as compensation therefor the unit prices set out in the contract; (9) that owner's vice-president promised contractors that if they would continue the work after owner had postponed shipment of unsold salvage, owner would see that contractors would lose no money by reason of the delay; (10) that contractors continued the work until February 20, 1948, in reliance upon such promises; (11) that contractors would have stored or loaded the brick taken from the cell linings, if directions had been received relating thereto; (12) that the reasonable value of all the services performed by contractors from August 21, 1947, to February 20, 1948, if paid now in cash is $112,000; (13) that after December 21, 1947, contractors did not agree to continue the work and accept as compensation therefor the unit prices set out in the contract of August 21, 1947; (14) that owner did not notify contractors of the requirements of a sales contract with Union Pipe and Machinery Company in time to allow contractors to meet such requirements without extra cost and expense; (15, 16, 17 and 18 were conditional issues and were not answered); (19) that the acts, conduct or silence of contractors would not lead a reasonably prudent person to believe that contractors would not thereafter complain of the failure of owner to spot cars for loading; (20) that from the first month of the contract of August 21, 1947, to February 20, 1948, owner did not at all times have unfilled sales contracts for salvage in substantial quantities for loading which contractors failed to load; and (21) that the failure to so load was not caused by contractors.

Upon the jury's findings, after allowing owner credit for all payments made, the court entered judgment for contractors for $51,290.63.

Appellant predicates this appeal on twenty-seven points, the first of which complains that the trial court erred in construing the contract so as to require the owner to have cars spotted for loading upon contractors' request without regard to owner's sales contracts. An examination of the entire contract directs attention to paragraph two thereof for a determination of the intention of the parties as to the loading requirements. Provision is there found that the work shall be performed under the direction of owner's engineer; that the work will be so planned that salvage will be ready for shipment in time to meet owner's sales contracts; that owner will give advance notice to contractors in order that contractors may meet the sales requirements without extra cost and expense, and that owner shall have cars spotted for loading as soon as they can be procured after owner is notified by the contractors of their loading requirements and dates of loading.

The record shows that the purpose of owner in purchasing the seven buildings was to dismantle the same, convert their contents into salvage and scrap and sell it upon the markets. The buildings were large and their contents consisted of heavy materials such as large steel bins, steel tanks, furnaces, motors, structural steel wiring and other equipment. In order to do the work, contractors were required to assemble and maintain expensive equipment, machinery and labor, which necessitated expending a large amount of money per month for lease of machinery, labor and insurance. Final credits to contractors from the $45,000 advance payment as well as progress payments could not be had until after the scrap and salvage was loaded and its weight then determined.

At the time the contract was being negotiated, owner's vice-president, who negotiated the same with contractors, stated it was a rush job, that it would have to be completed within four months in order for

the parties to make a profit, and stated to contractors that if they did not think they could do it in four months there was no need for them to consider it; that there would be no difficulty in disposing of the materials when they were taken down; that they were practically sold; that cars could be gotten and it was up to contractors to get the material out. The parties were each cognizant of the fact that, under the terms of the "Invitation for Bids and Specifications for Sale of Buildings and Installed Equipment," the Government could forfeit the rights of owner under its purchase contract.

Contractors began the work but cars were not made available for loading as the work progressed, this resulted in the piling up of materials which limited contractors' working area and necessitated additional handling of the materials.

During the first month of operations contractors complained to owner about not getting cars to load and were told not to worry the matter would be taken care of and contractors would not lose anything; that restitution would be made for the extra cost and damage caused by contractors not being able to load. After the dismantling of the buildings was practically complete, it was necessary for contractors to maintain their machinery, equipment and labor on the ground, and contractors' expense continued until work was stopped February 20, 1948.

In its brief owner concedes that the delay in loading salvage was due to a failure to have sales. The record further shows there were more ready sales for scrap than for salvage, but owner preferred to sell the suitable materials as salvage rather than as scrap.

■ We think the parties themselves construed the contract and their intention as to the loading requirements, evidence supra. When the contractors complained of the failure to furnish cars they were told not to worry, the matter would be taken care of, and restitution would be made for the extra cost and expense. Such construction by the parties is the highest evidence as to what their intention was. Lone Star

Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504.

■ The contractors could not fully perform the contract and could not finally receive payment for their performance, until the scrap and salvage was loaded on cars furnished by the owner. We think the contract imported an agreement on the part of the owner to spot cars which the contractors could load without delay, and that it is inconsistent with an implication that the parties intended to contract to leave the contractors without remedy for the delays of the owner. Guerini Stone Co. v. J. P. Carlin Const. Co., 248 U.S. 334, 39 S.Ct. 102, 63 L.Ed. 275; Jones & Co. v. Gammel-Statesman Pub. Co., 100 Tex. 320, 99 S.W. 701, 8 L.R.A.,N.S., 1197. From the entire contract, we think this implication is necessary to arrive at the intent of the parties, and that owner agreed to furnish cars sufficient to meet contractors' loading requirements. 10 Tex.Jur., Sec. 184, p. 320; 17 C.J.S., Contracts, § 328, p. 778. The owner failing to so furnish cars, the contractors had the right to cease performance, repudiate the contract, and sue for their damages. McFaull v. Collins, Tex.Civ.App., 208 S.W.2d 142, Er.Ref.; 7 Tex.Jur., p. 608, Sec. 51; Taylor-Fichter Const. Co. v. Curtis, Tex.Civ.App., 144 S.W.2d 285, Er.Dis. Judgment Correct.

■ The fact that the payments to contractors were to be measured by units of weights after the materials were loaded on the cars did not make the contract divisible, but the duty to furnish cars for loading was a condition precedent to the contractors' obligation to proceed. Guerini Stone Co. v. P. J. Carlin Const. Co., supra.

■ Whether or not time is of the essence of a contract depends upon the facts; the question is for the court if the contract is unambiguous, or if the subject matter is such that the court will take judicial notice that the parties so intended it. 10 Tex.Jur., p. 418, Sec. 239. The evidence shows the purpose of the contract before us was to place salvage and scrap on the market for sale by the owner; if the materials were not gotten out and loaded, there was a risk of forfeiture by the Gov-

ernment under the provisions of the "Invitation for Bids and Specifications for Sale of Buildings and Installed Equipment." Under the evidence, supra, owner's vice-president was plain in his statement that it was a rush job and would not be profitable if it was not completed within the four-month period provided in the contract. We think time was made of the essence of the contract by the stipulations of the parties and from the very nature of the subject matter. Von Harten & Clark v. Nevels, Tex.Civ.App., 234 S.W. 676; United Irr. Co. v. Carson Petroleum Co., Tex.Civ.App., 283 S.W. 692, Er.Dis. The contractors were to plan the work so as to have the salvage ready for loading to meet the owner's sales, of which sales the contractors were to be given advance notice so that contractors could meet such requirements without additional cost and expense, and owner was required to spot the cars for loading as soon as they could be procured after being notified by contractors of their loading requirements and the dates for loading. Thus the covenants of the contract imposed on each of the parties duties material to its complete performance, and a breach of such covenants by either would be actionable. Further, when contractors protested the owners failure to furnish cars for loading, owner told them not to worry and promised restitution for the extra cost and damage caused by the delay. The parties themselves, then, construed the contract to be one of which time was of the essence. Garrison v. Cook, 96 Tex. 228, 72 S.W. 54, 61 L.R.A. 342, 97 Am.St.Rep. 906.

By the jury's answers to issues 3, 4, 5 and 6, supra, contractors made a request to owner to furnish cars; the owner failed to so furnish them; there was extra cost and expense to contractors because of such failure, and but for such failure to furnish cars, the work would have been completed by December 21, 1947. There is evidence in the record that by the end of the second week after August 21, 1947, there was both scrap and salvage ready for loading; that by the end of October 1947, the work of dismantling the buildings was practically complete, and that if cars had been available for loading the job could have been completed in four months. Owner's engineer said there were only two or three occasions that cars were not furnished by the railroad which "hampered" owner, though there was numerous slight delays. The jury's answers to the issues find support in the evidence.

The owner says that findings 3, 4, 5, and 6, supra, show only that contractors had a cause of action for damages resulting from the breach of a subordinate agreement. The delay in performance was due to the failure of owner to furnish cars for loading. In such cases, " * * * a party who, being prevented by the fault of the adverse party from completing such contract in the time stipulated, goes on with the work after such time until compelled to abandon it may recover the value of the work done on a quantum meruit, and is not governed by the stipulations of the contract." 12 Am.Jur., p. 916, Sec. 351; Mc-Faull v. Collins, supra. In such cases the measure of damages is the reasonable value of the services rendered. Hearne v. Garrett, 49 Tex. 619. This being the measure of damages submitted by the court, it was correct. Such damages are not limited to the contract price. Hearne v. Garrett, supra; Thompson v. Smith, Tex.Com.App., 248 S.W. 1070; 17 C.J.S., Contracts, § 367, p. 834; 9 C.J., p. 822, Sec. 159(b). 17 C.J.S., Contracts, § 367, page 824.

The owner requested the trial court to submit issues as follows:

"8a. Do you find from a preponderance of the evidence that plaintiffs continued to perform work and accept payments from the defendant under the contract, with knowledge of the failure, if any, of the defendant to spot cars for loading?"

"15. Do you find from a preponderance of the evidence that plaintiffs continued to dismantle and disassemble the machinery, equipment and appliances in the buildings covered by the contract, after December 21, 1947, and to receive and accept payment therefor at the rate provided in the contract?"

We think submitted issues 7, 8, 8a, 9, 10 and 13, supra, was a submission of all the material elements of defense included in the requested issues. The owner, however, says the issues was a requested

submission of its affirmative defense of waiver and estoppel. It has been said that a waiver does not occur unless intended, or is an act relied on which in equity ought to estop the party from denying it. M. K. & T. Ry. Co. v. Hendricks, 49 Tex.Civ. App., 314, 108 S.W. 745. Er.Ref. A party not in default, may recognize a contract and give the other party an opportunity to comply and if, in such case, the other party promises to comply, a continuance of the work under such circumstances would not be a waiver of contractors' rights nor work an estoppel against the assertion of such rights. Marsalis v. Thomas, 13 Tex.Civ. App., 54, 35 S.W. 795. Er.Ref.; 10 Tex. Jur., p. 466, Sec. 270.

█ The contract by its own terms expired December 21, 1947, at which time the salvage and scrap had not all been sold and loaded, which was the very purpose for which owner purchased the buildings and entered into the contract with contractors. The owner does not dispute that the work was continued until February 20, 1948. The jury found that the work was continued in reliance on a promise that contractors would not lose money by reason of the delay in the performance of the contract. Issues 9 and 10, supra. Owner admits the delay was caused by the failure to have sales for salvage. By their answer to issue 13, the jury found that contractors did not agree to continue the work and accept the unit prices set out in the contract of August 21, 1947. We find no evidence that the owner was deceived, mislead or induced, by contractors, to change its position with reference to the subject matter of the contract which resulted to its injury. In the absence of such evidence, an estoppel against contractors would not arise. 17 Tex.Jur., Secs. 9 and 12, pp. 137 and 141.

█ Owner complains of the trial court's refusal to submit its requested issues 7, 8a, 8b and 8c. No. 7 asked if the failure of owner to spot cars for loading, if there was such failure, was known to contractors at all times. The request was that if this issue was answered "Yes" that the jury answer Nos. 8a, 8b and 8c. We have already discussed issue 8a. No. 8b asked whether or not the conduct or silence of contractors, if any, would lead a reasonably prudent person to believe contractors would not thereafter complain of the failure to spot cars, and 8c asked if owner, in allowing contractors to continue performance of the contract and in continuing to make payments to contractors, believed and relied upon the acts, silence or conduct of contractors that contractors would not thereafter complain of the failure to spot cars for loading? No. 7 was not a disputed issue. Owner says the failure to furnish cars was due to the failure to have sales for salvage, and there is no dispute in the record as to such failure, or that contractors knew that cars were not furnished. Submitted issue 19, supra, was substantially, if not exactly, the same as requested issue 8b, and was answered "No." The owner then had the benefit of the submission of this issue. The issues were requested in support of owner's pleas of waiver and estoppel, but we are of the opinion that the evidence is not sufficient to raise the issues, and that the failure to submit 8c was not error. Authorities, supra.

█ Owner complains of the refusal of the trial court to submit its requested issues 5 and 6. No. 5 inquired if contractors, on February 20, 1948, had failed to earn under the contract all of the $45,000 advance payment, and No. 6 inquired what amount of money, if any, did contractors fail to earn under the contract out of the $45,000 advance payment.

The points do not present error because the suit is not on the contract but is for recovery of the reasonable value of the services performed by contractors, which reasonable value was asked by issue 12, supra, and the judgment rendered gave owner credit for the advance payment.

█ The trial court admitted in evidence an agreed judgment entered in cause No. 80,007. In that cause contractors sought a receivership as against owner and the cause was terminated by owner giving a bond in the sum of $75,000, which was given and accepted as a substitute for contractors' claims for liens and for receivership. Under this judgment owner continued in possession of the property. The

bond was conditioned that owner will pay to contractors the full amount of any judgment finally recovered by contractors. The judgment was offered for the limited purpose of showing good faith and the disposition made of the receivership proceedings, which proceeding was pleaded by owner. The trial court limited the admission of the judgment as follows:

"Gentlemen of the Jury, that order of the Court is permitted to come before you simply for the purpose of showing the arrangements of the party under which this property was handled after the matter reached the Court, and you are not to consider the signing of the Order as an expression of any opinion by the Court as to the rights or merits of the controversy which is to be submitted to you."

Owner alleged that contractors wrongfully walked off the job February 20, 1948, without warning and sought to have a receiver appointed to take over the property and assets of owner—sought to take owner's property away from it with a receivership—were attempting to destroy the written contract—and such action was wholly lacking in business conscience or a sense of fair play. These pleadings were read to the jury in connection with owner's cross action, and, therefore, the receivership proceeding was injected into the case by owner. Under the record before us, we think the point presents no error. See Campbell v. McLaughlin, Tex.Com.App., 280 S.W. 189, and Wise v. Haynes, Tex.Civ.App., 103 S.W.2d 477.

 Complaint is made that the trial court refused to permit the owner to offer testimony to show that the contract was extended by act of the parties after December 21, 1947. We are not directed to any evidence so excluded and so we do not know what such evidence was; however, we have already referred to testimony of a like nature, namely, the testimony that owner's vice-president told the contractors they would not lose anything and would be reimbursed for the delay. The complaint seems to be predicated on a statement of the trial court, made out of the presence of the jury and during a conference with attorneys, that "the contract had to be per-

formed in four months or somebody was going to pay the penalty." This statement was not communicated to the jury and we are unable to determine in what way the owner was prejudiced. Even though owner was allowed a full bill, no excluded evidence is brought forward for our consideration. Therefore error is not shown. 41 Tex.Jur., p. 929, Sec. 160.

 In the course of the examination of Mr. Bland, one of the contractors, he was asked questions relative to a conversation with owner's vice-president, Mr. Strassman, wherein profits to contractors were discussed, and such profits were estimated to be thirty-three and one-third per cent of the gross receipts, or $20,000. Owner's counsel asked for and was given a general exception to the whole line of testimony. Prior to this time Mr. Bland had given, without objection, substantially the same testimony and stated that Mr. Strassman told him contractors had practically a $20,000 profit in the job, plus the materials they would receive out of it. The exception to the testimony goes no further than above stated. Under the circumstances reversible error is not presented. 41 Tex.Jur., pp. 929 and 930, Secs. 160 and 161.

 Owner made a general objection to the testimony of Mr. Bland that contractors would receive $3,333.33 for fire brick, and referred the court to the contract and its provisions with reference to such brick. Mr. Bland said there were 200,000 brick out there and they were worth $50 per thousand, and that contractors were to receive one-third of the value. The evidence was admissible on the issue of damages sustained by contractors. Under the contract, contractors were to receive one-third of the sales price of such brick.

Owner complains of the following proceedings had at the close of a day's session of the court, at which time owner's attorney had requested a witness to read a letter which had theretofore been offered in evidence by contractors and at that time had been read to the jury.

The trial court stated the letter had been read to the jury; that he was going to insist that evidence not be repeated; that to

keep reading the same thing is arguing the case, and that he was going to ask the witnesses not to repeat any testimony. Thereupon he declared the court would recess until the following Tuesday morning, and stated he hoped more progress would be made the next week than had been made in the last two; that the attorneys should do all in their power to move along faster, and that he was going to insist that the attorneys avoid repetition and move along faster.

Owner's attorney took exception to the court's statements on the ground that such remarks were addressed to him; called the court's attention to the fact that contractors had consumed two weeks in putting on their evidence, and that owner had begun putting on evidence only about an hour before, and that the remarks were prejudicial to owner and not fair in so far as they were directed to owner's attorney.

 It is, of course, the duty of the trial court to prevent unnecessary delays and repetition, but in so doing he must not attribute misconduct to one attorney rather than another, nor should he suggest that it is his opinion that one party is guilty of causing delay. It is our opinion that the complained of remarks do not present reversible error. 41 Tex.Jur., p. 736, Sec. 30. The fact that the remarks were made at a time shortly after owner had begun offering its testimony, but immediately before adjournment for the week, does not justify a conclusion that the remarks were directed exclusively to owner's attorney to the exclusion of others.

By its twenty-seventh point owner says the finding of the jury that $112,000 was the reasonable value of all the services rendered by contractors is manifestly too large. Contractors' bookkeeper testified from contractors' books and said that the total cost of the job was $124,021.72 which included an item of ten per cent added as overhead expense, but no profits.

By deducting the ten per cent for overhead expenses, the costs would be reduced a little below the amount found by the jury. However, in addition to the above testimony, the evidence shows that a portion of the materials in the buildings had been dismantled by contractors but had not been loaded on February 20, 1948. This service was of some benefit to owner. McFaull v. Collins, supra. Further, contractors laid claim to one-third of the value of fire brick taken from the cell linings and which they said amounted to $3,333.33.

This evidence is sufficient to support the jury's finding, for which reason it must be upheld. A further discussion of evidence in support of such finding is not necessary.

We find no reversible error in the record before us, and the judgment of the trial court is affirmed.

Affirmed.